**LAND et al. v. DOLLAR et al.**

**SAWYER, Secretary of Commerce v. DOLLAR et al.**

Nos. 10955, 10956.

United States Court of Appeals District of Columbia Circuit.

April 11, 1951.

See also 97 F.Supp. 50.

Gregory A. Harrison, Moses Lasky, San Francisco, Cal., for R. Stanley Dollar and others, petitioners for rule to show cause.

J. Howard McGrath, Atty. Gen., Newell A. Clapp, Acting Asst. Atty. Gen., Edward H. Hickey, Paul A. Sweeney, Dept. of Justice, Washington, D. C., for Charles A. Sawyer and others, respondents to rule to show cause.

Francis B. Myers, Dept. Commerce, Washington, D. C., for respondent Charles A. Sawyer.

Albert B. Luckey, Jr., Washington, D. C., with whom Arthur B. Dunne, San Francisco, Cal., of the bar of the State of California, was allowed to appear, for respondent George Killion.

Before CLARK, WILBUR K. MILLER and PRETTYMAN, Circuit Judges.

PRETTYMAN, Circuit Judge.

Many reasons impel us to state formally on the record the considerations which led us on Friday last to order the present respondents to show cause why they should not be held in contempt of the court. We do so before we hear the parties in response to the rule, and thus before we even begin to consider whether they are guilty of the charges made against them by their adversaries. The issuance of the rule was itself a step to be taken only upon the most valid and compelling grounds. The parties are entitled to know the reasons for the citation, regardless of whether they are guilty or not guilty.

This is the fourth time this case has been before us. It has been before the Supreme Court three times. The first time, that Court, without dissent, rendered an opinion which has been the guide for every subsequent action of this court. The second and third times, the Supreme Court refused to grant certiorari when the United States, Secretary Sawyer, and the respondent parties to the litigation petitioned it to review and reverse judgments of this court. Nevertheless, we have once more carefully reviewed the whole course of the litigation, have reexamined the pertinent authorities, and have meticulously searched again the directive of the Supreme Court in respect to the case. We embarked upon that task even though the result might be merely to bring fresh finality to what has already been established.

I.

We must first recall the sequence of events. Prior to 1938 the Dollar Steamship Lines encountered financial difficulties due to the depression and strikes in the industry. It had borrowed money from the United States Maritime Commission (or its

predecessor, the Shipping Board), which had been authorized by statute to make such loans and to accept and handle collateral therefor. The company needed more money and applied for and received it, making its total debt to the Commission some $7,500,000. Prior to that time the debt had been guaranteed by personal sureties. When the last loan was made, the Commission released those sureties and the Dollar stockholders endorsed and delivered to the Commission certificates for 92% of the stock. The Commission caused new certificates to be issued in the name of the "United States Maritime Commission". The Commission took over management of the company. With the war, prosperity came to the company. By 1945 its entire debt had been paid in full with interest. The former Dollar stockholders thereupon demanded the return of their stock. The demand was refused, and they brought against the members of the Maritime Commission a suit in the nature of an action to redeem collateral, praying the return of the shares. The District Court of its own motion dismissed the suit as being one against the United States and therefore not to be entertained without its consent.

Upon appeal this court, in an exhaustive opinion by Judge Clark, held that in order to determine whether or not the United States was a necessary party it was necessary to determine, by taking evidence, whether the shares were property of the United States; and that that question depended upon whether the transaction in 1938 was an outright transfer, as claimed by the Commission, or was a pledge of collateral for a loan, as claimed by the company. Dollar v. Land, 1946, 81 U.S.App. D.C. 28, 154 F.2d 307. Certiorari being granted, the Supreme Court unanimously affirmed that judgment in an opinion by Mr. Justice Douglas which we shall discuss in detail in a moment. Land v. Dollar, 1947, 330 U.S. 731, 67 S.Ct. 1009, 91 L.Ed. 1209.

Trial was thereupon had in the District Court, and the ensuing judgment, Dollar v. Land, D.D.C.1948, 82 F.Supp. 919, was appealed to this court. We held that the 1938 transaction was a pledge and directed the District Court to order the return of the shares. Dollar v. Land, 1950, 87 U.S. App.D.C. 214, 184 F.2d 245. The Supreme Court denied certiorari. Land v. Dollar, 1950, 340 U.S. 884, 71 S.Ct. 198. Pursuant to our mandate the District Court entered its order, but added a recital that its judgment was determinative of the title to the shares.

Meantime, the Maritime Commission had been abolished by a Presidential Reorganization Plan and the Secretary of Commerce had succeeded to possession of the shares. He announced that fact to the District Court, appearing specially and stating that he was not submitting himself to the jurisdiction of that court. He appealed from the order entered. The United States also appeared specially in the District Court, stating that it was not submitting itself to the jurisdiction of the court, and appealed from the order. The former members of the Maritime Commission also appealed.

This court held that the judgment should be restricted to possession of the shares, and we directed the District Court to enter an order which we prescribed in exact terms. Land v. Dollar, 88 U.S.App.D.C. —, 188 F.2d 629. That decree, as included in our mandate, was that the Maritime Commission, or its successor in possession, deliver to the Dollar interests the effective possession of the shares and that they perform whatever acts were necessary to transfer such possession. The Supreme Court denied certiorari. Land v. Dollar, 1951, 340 U.S. 948, 71 S.Ct. 533.

The District Court thereupon, on March 16, 1951, entered the order which we had directed. It also included, by way of specification, directions that the officials then in possession of the shares endorse the certificates and order the transfer of the shares upon the record books of the corporation. The court added that, if this endorsement were not made and these instructions were not given by Sawyer, they would be made by the clerk of the court. The defendants in the action and Sawyer appealed to this court from that judgment. Those appeals are now pending here, and constitute the proceeding in which the present actions are being taken.

On March 16, 1951, Sawyer delivered the certificates for the stock to the representatives of the Dollars, but he refused to endorse them or to direct the transfer of the shares. On the same day, he executed a proxy in his own name as Secretary of Commerce, giving three employees of the Department of Commerce full power and authority to act for him and in his name as Secretary of Commerce at the annual meeting of the corporation to be held on March 19, 1951, and to vote "all shares of stock which stood in the name of the United States Maritime Commission on Feb. 26, 1951". On March 18, 1951, Philip B. Fleming executed a similar proxy to the same three persons, signing the name of the United States Maritime Commission by him as Acting Secretary of Commerce.

It is alleged to us that the three persons having the proxies just described appeared at the annual meeting of the corporation, and that representatives of the Dollar interests also appeared with the certificates endorsed by the clerk of the court; that George Killion, presiding as president of the corporation, recognized the proxies of Sawyer and Fleming and refused to recognize the Dollar interests; and that the three proxies of Sawyer and Fleming then voted all these shares.

It is also alleged to us that Newell A. Clapp, an acting Assistant Attorney General of the United States, wired and wrote the transfer agent of the corporation, referring to the decision of this court and warning it not to take any action "in derogation of the title to said stock claimed by the United States."

It is further alleged to us that on March 12, 1951, Newell A. Clapp, Edward H. Hickey, Donald B. MacGuineas, and Philip H. Angell, officials of the Department of Justice, signed and caused to be filed in the United States District Court for the Northern District of California a complaint in the name of the United States; that in that complaint they prayed that the United States be declared the true and lawful owner of the shares of stock in the Steamship Lines and to be entitled to the right to possession of the shares; that the Dollar interests be enjoined from exercising any rights or privileges as owners of the shares or demanding any new certificates for the shares. It is alleged to us that in that complaint it was stated, among many other statements of similar effect, that the United States "continues to be the true and lawful owner of said shares and certificates notwithstanding any judgments or proceedings in said action No. 31468 in the United States District Court for the District of Columbia". It is further alleged to us that in a motion for preliminary injunction filed in the foregoing suit in California on March 19, 1951, it was stated over the signature of Philip B. Angell and Donald B. MacGuineas, attorneys in the Department of Justice, that the United States considers the judgment and decree of this court, holding the 1938 transaction to be a pledge, to be "a serious miscarriage of justice and for that reason has declined, by direction of the President, to acquiesce in it." That statement is alleged to be in paragraph 11, on page 7 at lines 9 to 11 of that motion.

The litigation being before this court upon appeals by the defendant former members of the Maritime Commission and by Charles Sawyer, the appellee Dollar representatives petitioned this court for sanctions against the persons now before us and for issuance of a rule to show cause in contempt directed to them, alleging as we have indicated various acts of disobedience and defiance of our decree, and intentional attempts to nullify the decree which we directed the District Court in this jurisdiction to enter.

II.

We now examine the decision and opinion of the Supreme Court in Land v. Dollar, 1947, 330 U.S. 731, 67 S.Ct. 1009, 1011, 91 L.Ed. 1209, which opinion is the guide and the control in this controversy. In the course of its opinion, which was without dissent, the Court said:

"The allegations of the complaint, if proved, would establish that petitioners are unlawfully withholding respondents' property under the claim that it belongs to the United States. That conclusion would follow if either of respondents' contentions were established: (1) that the Commission

had no authority to purchase the shares or acquire them outright; or (2) that, even though such authority existed, the 1938 contract resulted not in an outright transfer but in a pledge of the shares.

"If respondents are right in these contentions, their claim rests on their right under general law to recover possession of specific property wrongfully withheld. At common law their suit as pledgors to recover the pledged property on payment of the debt would sound in tort.

"If viewed in that posture, the case is very close to United States v. Lee, 106 U.S. 196 [1 S.Ct. 240, 27 L.Ed. 171]."

The Court then described the Lee case and summarized the ruling there made. It said:

"* * * The Court affirmed the judgment over the objection that the suit was one against the United States. It held that the assertion by officers of the Government of their authority to act did not foreclose judicial inquiry into the lawfulness of their action; that a determination of whether their 'authority is rightfully assumed is the exercise of jurisdiction, and must lead to the decision of the merits of the question.' [106 U.S. at page 219, 1 S.Ct. at page 259, 27 L.Ed. 171.] It further held that while such an adjudication is not res judicata against the United States because it cannot be made a party to the suit, the courts have jurisdiction to resolve the controversy between those who claim possession. And it concluded that an agent or officer of the United States who acts beyond his authority is answerable for his actions. [Citing cases.]

"Where the right to possession or enjoyment of property under general law is in issue, and the defendants claim as officers or agents of the sovereign, the rule of United States v. Lee, supra, has been repeatedly approved. [Citing cases.] That rule is applicable here although we assume that record title to the shares is in the Commission. In United States v. Lee, supra, record title of the land was in the United States and its officers were in possession. The force of the decree in that case was to grant possession to the private claimant. Though the judgment was not res judicata against the United States [106 U.S. at page 222, 1 S.Ct. at page 262, 27 L.Ed. 171], it settled as between the parties the controversy over possession. Precisely the same will be true here, if we assume the allegations of the complaint are proved. For if we view the case in its posture before the District Court, petitioners, being members of the Commission, were in position to restore possession of the shares which they unlawfully held."

Then the Court laid down the course of the case at bar in the following language, upon which no amount of elaboration or explanation can improve:

"* * * But public officials may become tort-feasors by exceeding the limits of their authority. And where they unlawfully seize or hold a citizen's realty or chattels, recoverable by appropriate action at law or in equity, he is not relegated to the Court of Claims to recover a money judgment. The dominant interest of the sovereign is then on the side of the victim who may bring his possessory action to reclaim that which is wrongfully withheld.

"*It is in the latter category that the pleadings have cast this case. That is to say, if the allegations of the petition are true, the shares of stock never were property of the United States and are being wrongfully withheld by petitioners who acted in excess of their authority as public officers. If ownership of the shares is in the United States, suit to recover them would of course be a suit against the United States. But if it is decided on the merits either that the contract was illegal or that respondents are pledgors, they are entitled to possession of the shares as against petitioners,* though, as we have said, the judgment would not be *res judicata* as against the United States. See United States v. Lee, supra [106 U.S. at page 222, 1 S.Ct. at page 262, 27 L.Ed. 171]." (Italics supplied.)

No amount of argument can becloud the plain words—which we repeat for emphasis. The Court was speaking of the very case which is now once more before us. It said: "* * * if the allegations of the petition are true, the shares of stock

never were property of the United States and are being wrongfully withheld by petitioners who acted in excess of their authority as public officers."

And again it said: " * * * if it is decided on the merits either that the contract was illegal or that respondents are pledgors, they are entitled to possession of the shares as against petitioners, though, as we have said, the judgment would not be *res judicata* as against the United States."

Pursuant to that judgment of the Supreme Court, the case was tried on the merits in the District Court and then appealed to us. This court held, in Dollar v. Land, 1950, 87 U.S.App.D.C. 214, 184 F.2d 245, that the allegations of the complaint were established, that the transaction in 1938 was a pledge in the nature of collateral. The Supreme Court denied a writ of certiorari which the Government officials sought.

It is crucial to the present problem to state precisely what that judgment of this court meant. We do so in the words of the Supreme Court opinion which we have discussed. It meant, according to the Supreme Court, that "the shares of stock never were property of the United States". It meant that the shares "are being wrongfully withheld by petitioners [that is, the Government officials] who acted in excess of their authority as public officers." It meant that the Dollar interests "are entitled to possession of the shares as against petitioners". So much is crystal clear beyond peradventure of doubt. In so far as the parties to this suit are concerned, it has been finally adjudicated by the courts that the shares were never property of the United States and that the Dollar interests are entitled to possession of them. Those are no longer litigable issues so far as these parties, their privies, agents, representatives and attorneys are concerned.

What then is the meaning of the further holding of the Court that "the judgment would not be *res judicata* as against the United States"? Obviously it meant that, although the judgment would determine the issues between the parties, it would not determine them so far as the United States, as such, separate and apart from the officer-parties to the suit, is concerned. And the Court pointed to the source wherein lies the explanation. It said "See United States v. Lee, supra, [106 U.S. at page 222, 1 S.Ct. at page 262, 27 L.Ed. 171]."

### III.

We must turn then to examine United States v. Lee, 1882, 106 U.S. 196, 1 S.Ct. 240, 259, 27 L.Ed. 171. This was an action brought by George W. P. C. Lee, as devisee of his grandfather, George Washington Parke Custis, to recover possession of what is now Arlington Cemetery. The defendants were officers of the United States in possession of the property by designation in the course of official duty. The Attorney General of the United States, appearing only for the purpose of the motion, and without submitting the United States to the jurisdiction of the court, moved that the case be dismissed, upon the ground that the property was held and occupied by the United States as public property for public uses, and by virtue of a certificate of sale to the United States, under which the claim of title of the United States had been duly recorded. The title relied on by the defendant-officers was a tax-sale certificate, certifying that the land had been bid in by the United States at a tax sale.

In the trial court a jury determined that no title had been acquired by the United States under the tax-sale proceedings. The Supreme Court held that there was no error in that process of determination. Then the Court turned to consider the proposition asserted by the United States and by its officers that, though a jury had ascertained that what was set up in behalf of the United States was no title at all, the court could render no judgment in favor of Lee because the officers held the property as agents of the United States and it had been appropriated to public uses. The proposition rested on the principle that the United States could not be sued without its consent.

The Court examined at great length the cases on the subject and stated with elo-

quent comment its reasoning in respect to it. There was ample authority for, and the Court found the cases to be unanimous in, the conclusion that an individual private citizen who could establish a valid title to property held by agents of the United States could recover possession of that property even though the United States claims title and refuses to become a party to the suit.

The Court then said: "Looking at the question upon principle, and apart from the authority of adjudged cases, we think it still clearer that this branch of the defense cannot be maintained. It seems to be opposed to all the principles upon which the rights of the citizen, when brought in collision with the acts of the government, must be determined. In such cases there is no safety for the citizen, except in the protection of the judicial tribunals, for rights which have been invaded by the officers of the government, professing to act in its name. There remains to him but the alternative of resistance, which may amount to crime. The position assumed here is that, however clear his rights, no remedy can be afforded to him when it is seen that his opponent is an officer of the United States, claiming to act under its authority; for, as Mr. Chief Justice Marshall says, to examine whether this authority is rightfully assumed is the exercise of jurisdiction, and must lead to the decision of the merits of the question."

And proceeding further the Court said:

"No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All the officers of the government, from the highest to the lowest, are creatures of the law and are bound to obey it.

"It is the only supreme power in our system of government, and every man who by accepting office participates in its functions is only the more strongly bound to submit to that supremacy, and to observe the limitations which it imposes upon the exercise of the authority which it gives.

"Courts of justice are established, not only to decide upon the controverted rights of the citizens as against each other, but also upon rights in controversy between them and the government, and the docket of this court is crowded with controversies of the latter class.

"Shall it be said, in the face of all this, and of the acknowledged right of the judiciary to decide in proper cases, statutes which have been passed by both branches of Congress and approved by the President to be unconstitutional, that the courts cannot give a remedy when the citizen has been deprived of his property by force, his estate seized and converted to the use of the government without lawful authority, without process of law, and without compensation, because the President has ordered it and his officers are in possession?

"If such be the law of this country, it sanctions a tyranny which has no existence in the monarchies of Europe, nor in any other government which has a just claim to well-regulated liberty and the protection of personal rights.

"It cannot be, then, that when, in a suit between two citizens for the ownership of real estate, one of them has established his right to the possession of the property according to all the forms of judicial procedure, and by the verdict of a jury and the judgment of the court, the wrongful possessor can say successfully to the court, Stop, here, I hold by order of the President, and the progress of justice must be stayed."

Then the Court said: "Another consideration is that since the United States cannot be made a defendant to a suit concerning its property, and no judgment in any suit against an individual who has possession or control of such property can bind or conclude the government, as is decided by this court in the case of Carr v. United States, already referred to, [98 U.S. 433, 25 L.Ed. 209], the government is always at liberty, notwithstanding any such judgment, to avail itself of all the remedies which the law allows to every person, natural or artificial, for the vindication and assertion of its rights. Hence, taking the present case as an illustration, the United States may proceed by a bill in chancery to quiet its title, in aid of which, if a proper case is made, a writ of injunction may be obtained. Or it may bring an action of ejectment, in

which, on a direct issue between the United States as plaintiff, and the present plaintiff as defendant, the title of the United States could be judicially determined. Or, if satisfied that its title has been shown to be invalid, and it still desires to use the property, or any part of it, for the purposes to which it is now devoted, it may purchase such property by fair negotiation, or condemn it by a judicial proceeding, in which a just compensation shall be ascertained and paid according to the Constitution."

The respondents now before us have thus far rested their rights in large part upon one sentence in United States v. Lee, and particularly upon the latter clause of it. That sentence is "Hence, taking the present case as an illustration, the United States may proceed by a bill in chancery to quiet its title, in aid of which, if a proper case is made, a writ of injunction may be obtained." Respondents say that that statement means that the United States is entitled to an injunction permitting its agents to retain possession of property despite a final order of a court of competent jurisdiction ordering those agents to surrender possession.

The Lee case could not possibly have that meaning. The whole opinion of the Court is eloquent to the contrary effect. *The reference to an injunction clearly means that, possession having been delivered pursuant to court decree, and a suit to quiet title having been instituted by the United States, the new and lawful possessors might then be enjoined from acts which might impinge upon the eventual rights of the claimant to the title; such acts might be, for example, the destruction of the property or its sale or transfer.* The point is that the injunctive relief ancillary to the suit to quiet title may be in aid of that suit, but most positively it cannot be in nullification of a final decree entered by a competent court disposing of possession. Such a nullifying order would most clearly not be what the Court meant by "a proper case". An ancillary order *pendente lite* cannot be in complete conflict with a final decree already entered. If it were, the unadjudicated claim of the plaintiff in the later case would be given precedence over the right finally awarded in the earlier case. Such reverse order cannot be correct. Respondents argue that because they are entitled to an injunction in "a proper case", they are entitled to any injunction which they might seek. That is not the law, in our opinion. To sustain that contention would be to declare that one court can nullify the final decrees of another court which had jurisdiction,—a holding which would mean chaos and the complete collapse of every semblance of orderly judicial process, a consummation to the irreparable damage of the public interest.

It is noteworthy that in the Lee case the Government, having regard for the substance rather than the form of the court proceeding, did not attempt to re-litigate the title, as the Court said it had a right to do, but instead paid the Lees their asked price for the property.

IV.

We now come to a consideration of what these respondents are alleged to have done.

In the first place we must note that if it be proved that respondents acted in a common plan and design, no fine distinctions need be attempted between specific acts done by one or the other in pursuance of that plan. Those who superintended or advised are chargeable equally with those who actually performed. In the next place it is clear enough that a person who is the bona fide legal possessor of shares of stock is entitled to have certificates in his own name and to have those certificates recorded. This would seem to be particularly true where he is in possession by virtue of a final decree of a court of competent jurisdiction; and still more particularly so where he has established his ownership of the shares and has a valid judgment of the courts to that effect, except for one claimant which has an unadjudicated claim to title. It must be remembered in considering any pertinent niceties of corporation law that the Dollar interests have been adjudicated to be the owners of these shares. The single omission in the complete finality of our decree for all purposes here perti-

nent is that it was not *res judicata* against the United States; the United States has an unadjudicated claim to title. It is in the light of those generalties that we examine what is alleged.

It is alleged that respondents refused to endorse the certificates and refused to instruct the transfer agent to transfer the shares. It is true that they delivered the unendorsed certificates and that the clerk of the court made the endorsement and gave the instructions. Petitioners for the rule to show cause say several things about that. First, it is alleged by petitioners that, if respondents had endorsed the certificates and had issued the instructions in good faith, the transfer would have been carried out; what the officials failed to do was effective in preventing the transfer. Second, it is alleged that, after the endorsement and instruction of the clerk had proved ineffective, respondents could then have made the endorsement and given the instructions and the transfer would have occurred; this failure to act was also effective in preventing the transfer. Third, it is clear enough, without any allegations on the part of petitioners, that the decree of this court was directed at the shares of stock and not merely at pieces of paper called certificates, as respondents are alleged to have asserted.

It is next alleged that respondents executed proxies in their own names after the decree of this court was known to them. Copies of the alleged proxies in the papers before us do not show that they were executed in the name of the United States, which now claims to the true and lawful owner. They appear to have been executed in the name of and on behalf of persons who were and are parties to this suit and to whom our decree was directed. They would appear to have been so executed because those persons, and not the United States, were and are the record holders of the shares.

It is next alleged that at the annual meeting of the corporation respondents refused to recognize the decree of this court, or the endorsements or instructions of the clerk of the District Court, but on the contrary recognized the proxies presented by respondents.

It is next alleged that respondents warned, in writing, the transfer agent of the corporation not to transfer the shares of stock.

It is next alleged that respondents sought and obtained from the District Court in Northern California an injunction against the Dollar interests, restraining them from attempting to secure compliance with the decree of this court. The bringing of that action by respondents, if proven, must be viewed in the light of the opinion of the Supreme Court in Toledo Scale Co. v. Computing Scale Co., 1923, 261 U.S. 399, 43 S.Ct. 458, 67 L.Ed. 719. See Steelman v. All Continent Corp., 1937, 301 U.S. 278, 57 S.Ct. 705, 81 L.Ed. 1085. And see also Holmes v. Rowe, 9 Cir., 1938, 97 F.2d 537, 539, and Crosley Corporation v. Hazeltine Corporation, 3 Cir., 1941, 122 F.2d 925, 928.

In the last place, respondents, using the epitome of contemptuous expression in respect to judicial action by characterizing the decree and judgment of this court as "a serious miscarriage of justice", are alleged to have announced, formally, in writing to a Federal District Court, that they would not "acquiesce" in that judgment.

It is alleged that these various actions of respondents, separately and as a coordinated plan, constitute an attempt to defeat and nullify a decree finally entered by this court in the litigation, and thus constitute contempt of this court.

## V.

We now examine the suggestions and representations made to us in opposition to the issuance of a rule to show cause.

Whatever may have been the merits of the Government's claims prior to the final decision in this litigation, its claims as thus far represented to us do not appear to suggest a claim of present substance no matter from what viewpoint they are examined. Considered upon the plane of high policy and principle, petitioners picture the spectacle of a government which proclaims its adherence to law as the governing force among men, not only refusing for six years to submit to its own courts its own claim to private property derived from a purely commercial transaction, but endeavoring by

every device to thwart and defeat the judgment of those courts after it has been rendered. The ownership of these shares of stock is not a high function of government; it would be at the most an operation by the Government in a commercial field. The Government officials before us are not here defending the right and duty of the Government to govern; they are asserting its right to own shares in a purely private commercial enterprise.

■ Considered upon the next lower level, *i. e.*, legal issues upon the merits, the Government has not as yet been represented as advancing any claim which has not been finally adjudicated by the courts. The question whether the United States is the owner of this stock has been presented to the courts and has been decided. The only basis thus far presented for the claim that the United States owns the shares is that the transaction in 1938 was an outright acquisition and not a pledge. That issue has been adjudicated to a final conclusion in a judicial proceeding in which the issue was properly before the court. We say "a final conclusion" because surely an issue which has been considered three times by an appellate court and three times by the Supreme Court ought to be finally concluded. In that proceeding officials claiming to act as agents of the United States in respect to these shares were parties. The Attorney General of the United States, through his deputies and assistants, was counsel. The United States appears to seek to assert nothing of substance which has not been asserted and adjudicated. What the United States seems to assert is the right knowingly to stand aloof throughout a judicial proceeding and, when issues have been finally decided adversely to its views, to reassert those same issues by its same agents and its same counsel in another proceeding in another court. Under the rules respecting the forms of legal proceedings, it has that right, but in the present instance the right involves nothing of undetermined substance. The claim as presently presented is a patent prostitution of a principle of high public importance, which is that the Government may not be sued without its consent lest a mass of unimpeded litigation interfere with the performance of governmental functions.

■ Considering the present posture of this case upon the next lower level, which we might describe as the level of non-legalistic appeal, it is clear enough that if the allegations were proved, the protest of the Government officers and their counsel to the effect that they did what they could to comply is without merit. Every person who would have had a part in the delivery of effective possession of these shares is represented as being under the actual control of these officers and these lawyers. John L. Lewis and the United Mine Workers Union made precisely that same sort of contention in the second case of contempt against them, which was before this court. International Union, United Mine Workers of America v. United States, 1949, 85 U.S. App.D.C. 149, 177 F.2d 29. But we there held that, when upon the facts it was obvious that an authoritative word sincerely given by him and the Union would have been obeyed, they were guilty of contempt if the results showed that such word had not been given. The present case as thus far presented is even clearer than that. It would appear little less than absurd to say that, if the respondents presently before us had given authoritative instructions for the transfer, the transfer would not have occurred.

■ There are in the papers before us intimations of claims by the Government that the return of these shares would be an unjust enrichment of the Dollar interests. The idea is also reflected by the District Judge in California. The claim is in complete conflict with the most elementary concepts of the law of bankruptcy and receivership. An illustration will clarify: A debtor runs into the red until his creditor becomes alarmed and asks a court to appoint a receiver. The court appoints a nominee of the creditor. The receiver turns out to be a good manager, or prosperity for other reasons comes to the business. The erstwhile bankrupt earns profits and pays off all its debts. The court discharges the receiver, with congratulations, and turns the company back to its original

owners. There is nothing novel or startling in that procedure. It is one of the commonplaces of business life. It is not difficult to imagine what a court would rule if a receiver, after a successful administration of the affairs of a business concern and after the debts had been paid off, should assert that the return of the company to the original owners would be an unjust enrichment of those owners. It is indeed impossible to imagine such a receiver asserting a claim that, because he had been given management of a bankrupt concern and had produced a company with a valuable net worth, the company therefore now belonged to him. Merely to state such a claim is to demonstrate its absurdity. The whole purpose and philosophy of bankruptcy and receivership operation is to accomplish two purposes, (1) to pay off the debts and (2) to put the owner back on his feet and headed for a desirable prosperity.

The case before us is not materially dissimilar to the typical situation just pictured. The Maritime Commission was a lending agency similar in many respects to the Reconstruction Finance Corporation. It loaned money to the Dollar Steamship Lines. The Lines went deeper into trouble. The Commission, being a creditor, took over the management. Its operation was successful. The debt was paid off in full, with interest. It is difficult to accept as serious a claim that because of those facts a return of the company to the full control of its owners would unjustly enrich them.

Of course, receivers like receiverships. Courts often have great difficulty in requiring a receiver to bring his labors to an end and release the property. That phase of this case is no novelty. But we do not find a reported case in which such a receiver asserts a right to retain the property because to release it would unjustly enrich the owner.

The District Judge in California referred to "the people's money", apparently meaning money derived from the Treasury of the United States. The only such money which, so far as the record shows, went into this operation was the money which was loaned to the company by the Commission, and which was repaid in full with interest.

Considering the situation on the lowest level of mere technicalities, there appears little to support the Government's claim in the papers thus far presented to us. This stock appears never to have been in the Government's name. The United States, as such, has not been shown to have been at any time the record owner of the shares. It is not alleged that any certificate of stock was ever issued to the United States. The copies of the proxies in the record, alleged to have been executed on March 16th and March 18th, do not show execution by or in the name of the United States. The record stockholder was and still is the United States Maritime Commission. The certificates are alleged to have been and still to be in the name of the Commission. The proxies were executed by and on behalf of the Secretary of Commerce and the Commission. The claim of the United States appears to be that the Commission and the Secretary held the stock as its agents. But that particular claim has been finally adjudicated. Those very persons were parties (the Secretary being successor to the original parties) in the suit and their claim that they held the shares as agents of the United States was the very issue which was decided. That claim was the essence of the controversy. The courts have rendered a judgment which, in the words of the Supreme Court, was that the Commission and the Secretary in withholding the shares "acted in excess of their authority as public officers." While that judgment is not *res judicata* as to the United States, it is *res judicata* as to the Commission and the Secretary. And it is the Commission and the Secretary who have been ordered by this court to deliver possession of the shares. The claim of the United States does not appear to rest upon a record title or upon certificates issued to it, or upon any recorded fact whatever. It appears to rest upon a legal question of agency, and that question has been decided in a suit in which those agents made that claim.

## VI.

We now come to an examination into the law concerning contempt of court in respect to orders issued by a court. That law has

been recently stated in exhaustive detail by the Chief Justice of the United States, writing for the Supreme Court in United States v. United Mine Workers, 1947, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884.

That was a suit by the United States for a declaratory judgment. The defendants were John L. Lewis and the United Mine Workers Union. It appeared that Lewis had notified the members of the Union that the agreement with them, under which the coal mines were being operated, had terminated. The District Court issued an order restraining Lewis and the Union from continuing in effect that notice, from encouraging the miners to strike or to cease work, and from taking any action which would interfere with the court's jurisdiction and its determination of the case. Gradually the miners walked out. A rule to show cause why the defendants Lewis and the Union were not in contempt was issued, trial was had, a verdict of guilty was rendered, and both defendants were fined.

The Supreme Court first considered the applicability of the Clayton and Norris-LaGuardia Acts, 29 U.S.C.A. §§ 52, 101 et seq., and then reached the question of the contempt of court. It referred to United States v. Shipp, 1906, 203 U.S. 563, 27 S.Ct. 165, 51 L.Ed. 319, and quoted as follows from Gompers v. Buck's Stove & Range Co., 1911, 221 U.S. 418, 450, 31 S.Ct. 492, 501, 55 L.Ed. 797: "If a party can make himself a judge of the validity of orders which have been issued, and by his own act of disobedience set them aside, then are the courts impotent, and what the Constitution now fittingly calls the 'judicial power of the United States' would be a mere mockery."

The Court also said:

"Proceeding further, we find impressive authority for the proposition that an order issued by a court with jurisdiction over the subject matter and person must be obeyed by the parties until it is reversed by orderly and proper proceedings. This is true without regard even for the constitutionality of the Act under which the order is issued. In Howat v. [State of] Kansas, 1922, 258 U.S. 181, 189, 190 [42 S.Ct. 277, 280, 281, 66 L.Ed. 550], this Court said:

" 'An injunction duly issuing out of a court of general jurisdiction with equity powers, upon pleadings properly invoking its action, and served upon persons made parties therein and within the jurisdiction, must be obeyed by them, however erroneous the action of the court may be, even if the error be in the assumption of the validity of a seeming but void law going to the merits of the case. It is for the court of first instance to determine the question of the validity of the law, and until its decision is reversed for error by orderly review, either by itself or by a higher court, its orders based on its decisions are to be respected, and disobedience of them is contempt of its lawful authority, to be punished.'

"Violations of an order are punishable as criminal contempt even though the order is set aside on appeal, Worden v. Searls, 1887, 121 U.S. 14 [7 S.Ct. 814, 30 L.Ed. 853], or though the basic action has become moot. Gompers v. Buck's Stove & Range Co., 1911, 221 U.S. 418 [31 S.Ct. 492, 55 L.Ed. 797].

"We insist upon the same duty of obedience where, as here, the subject matter of the suit, as well as the parties, was properly before the court; where the elements of federal jurisdiction were clearly shown; and where the authority of the court of first instance to issue an order ancillary to the main suit depended upon a statute, the scope and applicability of which were subject to substantial doubt. The District Court on November 29 affirmatively decided that the Norris-LaGuardia Act was of no force in this case and that injunctive relief was therefore authorized. Orders outstanding or issued after that date were to be obeyed until they expired or were set aside by appropriate proceedings, appellate or otherwise. Convictions for criminal contempt intervening before that time may stand." [330 U.S. 258, 67 S.Ct. 696.]

The Court discussed the differences, both in nature and in proceedings, between criminal and civil contempt. It referred to

civil contempt as remedial or coercive relief. It said, "We will not assume that the defendants were not instantly aware that a usual remedy in such a situation is to impose coercive sanctions until the act is performed. This is a function of civil contempt."

Later the Court said:

"Sentences for criminal contempt are punitive in their nature and are imposed for the purpose of vindicating the authority of the court. Gompers v. Buck's Stove & Range Co., supra [221 U.S. at page 441, 31 S.Ct. at page 498, 55 L.Ed. 797]. The interests of orderly government demand that respect and compliance be given to orders issued by courts possessed of jurisdiction of persons and subject matter. One who defies the public authority and willfully refuses his obedience, does so at his peril. In imposing a fine for criminal contempt, the trial judge may properly take into consideration the extent of the willful and deliberate defiance of the court's order, the seriousness of the consequences of the contumacious behavior, the necessity of effectively terminating the defendant's defiance as required by the public interest, and the importance of deterring such acts in the future. Because of the nature of these standards, great reliance must be placed upon the discretion of the trial judge.

\*      \*      \*      \*      \*      \*

"The trial court also properly found the defendants guilty of civil contempt. Judicial sanctions in civil contempt proceedings may, in a proper case, be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained. Gompers v. Buck's Stove & Range Co., supra [221 U.S. at pages 448, 449, 31 S.Ct. at pages 500, 501, 55 L.Ed. 797]. Where compensation is intended, a fine is imposed, payable to the complainant. Such fine must of course be based upon evidence of complainant's actual loss, and his right, as a civil litigant, to the compensatory fine is dependent upon the outcome of the basic controversy.

"But where the purpose is to make the defendant comply, the court's discretion is otherwise exercised. It must then consider the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired."

The Court said further: "We are aware that the defendants may have sincerely believed that the restraining order was ineffective and would finally be vacated. \* \* \* They had full opportunity to comply with the order of the District Court, but they deliberately refused obedience and determined for themselves the validity of the order. When the rule to show cause was issued, provision was made for a hearing as to whether or not the alleged contempt was sufficiently purged. At that hearing the defendants stated to the court that their position remained then in the status which existed at the time of the issuance of the restraining order. Their conduct showed a total lack of respect for the judicial process. Punishment in this case is for that which the defendants had done prior to imposition of the judgment in the District Court, coupled with a coercive imposition upon the defendant union to compel obedience with the court's outstanding order."

The Court sustained a fine of $700,000 and an additional fine of $2,800,000 unless the defendant Union within five days showed that it had fully complied with the court's order.

In concluding the Court made the following observation: "We well realize the serious proportions of the fines here imposed upon the defendant union. But a majority feels that the course taken by the union carried with it such a serious threat to orderly constitutional government, and to the economic and social welfare of the nation, that a fine of substantial size is required in order to emphasize the gravity of the offense of which the union was found guilty. \* \* \* Loyalty in responding to the orders of their leader may, in some minds, minimize the gravity of the miners' conduct; but we cannot ignore the effect of their action upon the rights of other citizens, or the effect of their action upon our system of government. The gains, social

and economic, which the miners and other citizens have realized in the past, are ultimately due to the fact that they enjoy the rights of free men under our system of government. Upon the maintenance of that system depends all future progress to which they may justly aspire. In our complex society, there is a great variety of limited loyalties, but the overriding loyalty of all is to our country and to the institutions under which a particular interest may be pursued."

■ There can be little doubt of the teachings of that case. An order issued by a court having jurisdiction of the persons and subject matter must be obeyed, even though the defendants may sincerely believe that the order is ineffective and will finally be vacated, even though the Act upon which the order is based is void, even though the order is actually set aside on appeal, even though the basic action becomes moot. This must be the rule, said the Chief Justice, because of the necessities of orderly process under our constitutional system of government. Those necessities override every feeling of loyalty to leaders, or doubt as to validity, or of outrage as to the determination, or of shock as to consequence.

The dissenting justices in that case did not dissent upon any point pertinent to the present proceeding. Mr. Justice Black, speaking for himself and for Mr. Justice Douglas, agreed that the court had power summarily to coerce obedience to its orders, and to subject defendants to such conditional sanctions as were necessary to compel obedience. They mentioned disobedience to an affirmative court order as a typical example of an offense which must necessarily be dealt with summarily. On these points the justices were unanimous in their view. Mr. Justice Murphy dissented because he was of opinion that the restraining order was void under specific declaration of the Congress in the Norris-LaGuardia Act, but he pointed out that no man can violate with immunity an order which lies within the recognized power of the court and which had not been validly prohibited by Congress.

■ Let us apply that decision to the allegations made in the matter now before us. The respondent parties are alleged to be making themselves judges of the validity of the decree issued by the court. They believe that decree erroneous. They are alleged to believe that they can eventually in some other proceeding have the decree set aside. But none of those considerations, however sincerely entertained, can justify failure of the persons before us to comply with the decree, or minimize the duty of the court to compel compliance. The law which the courts applied to Lewis and the Miners is equally applicable to agents of the Government.

## VII.

We cannot conclude this statement of our views upon the situation presented to us upon the petition for the rule to show cause, without commenting upon some phases which appear to us more important than the mere ownership of a steamship line, however valuable.

There are almost always two sides to a controversy. The loser almost always thinks the court is wrong. The Department of Justice in this instance, although supposed to set the standard for the attitude and conduct of the bar toward the bench, appears upon the papers thus far before us to vent this well-nigh universal dissatisfaction at defeat by instigating an unseemly conflict between two courts, either of which might have had initial jurisdiction of the cause.

It must be kept in mind that the United States could have appeared in the District Court for the District of Columbia at any time while the litigation was in process there. It could have appeared there as readily, if not more readily, than in the District Court for the Northern District of California. The court here was as open to it as is the court there. The Department of Justice is alleged to have chosen not to appear here but to have chosen to await the decision here and then, if the result were unsatisfactory, to appear in another court upon precisely the same issues upon the same facts.

Of course judges differ in opinion, as other men do, and in the course of decision such differences frequently occur. In the established orderly processes those differences are resolved by a vote. The opinion of the majority becomes the rule in the case. It is not conceivable that a defeated lawyer should request a dissenting judge to attempt to exercise a power of injunction to stop the enforcement of the decree of his brethren. Different District Court judges frequently have the same question of law in different cases and frequently differ in opinion and conclusion upon the point. It is inconceivable that one such judge should attempt to nullify the conclusion of his brother already finally reached and formally entered in a case properly before him. Such an act on the part of a dissenting judge or of a different court not in the line of established appellate process, would be deemed to be an arrogant assumption of superiority not to be tolerated. No less deplorable, in our opinion, would be a deliberately designed action of the great legal department of the Government to attempt to throw into disorderly conflict two courts in respect to precisely the same controversy over the same facts. We have no authority to control policies of the Department but we have a serious duty to express an opinion upon a course of action which would in our opinion tend to bring the courts into public disrepute.

We have twice in open court inquired whether respondents would now take the steps required by the decree.

■ Upon all the foregoing considerations and upon the papers and statements presented to us prior to Tuesday of this week in these appeals, we could see no course open to us except to issue upon these respondents a rule to show cause why they are not in contempt of this court.

All that we have here said concerns only the rule, which is a requirement that the respondent officials answer the charges. The time has not yet arrived for them to make their replies. We do not intend to intimate any view upon whether they are guilty or not guilty. But, as we said in the beginning of this opinion, the issuance of this rule was itself a step of such gravity that we felt that the parties are entitled to know exactly why it was taken.

It would be a most happy event if, upon a return to the rule, it should be shown to the court that the Government officers who are respondents here did not commit the contemptuous acts which the petitioners charge them with having committed, or if it should develop that respondents have now complied, or intend forthwith to comply, fully and unreservedly with the decree which has been entered. The court awaits the return to its rule with both concern and hope.