**DOLLAR et al. v. LAND et al.**

No. C. A. 31468.

United States District Court
District of Columbia.

Dec. 2, 1948.

920

Gregory Harrison and Moses Lasky, both of San Francisco, Cal., and Michael M. Kearney and Clinton M. Hester, both of Washington, D. C., for plaintiffs.

Melvin H. Siegel and Donald B. Mac-Guineas, both of Washington, D. C., for respondents.

McGUIRE, District Judge.

This is the second time this cause has been before this Court. Originally it was dismissed *sua sponte* by the trial judge as being a suit against the United States. The plaintiffs appealed. The Court of Appeals reversed and remanded the cause for trial on the merits. Dollar v. Land, 1946, 81 U.S.App.D.C. 28, 154 F.2d 307. Later this judgment was affirmed in the Supreme Court. Land v. Dollar, 1947, 330 U.S. 731, 67 S.Ct. 1009, 91 L.Ed. 1209. Thereupon a lengthy trial was had and the record is voluminous.

The plaintiffs allege that they are stockholders of Dollar Steamship Lines, Inc., Ltd., for the purposes of this opinion called Dollar of Delaware, and whose corporate name was changed to American President Lines, Ltd. consequent to the execution of the contractual agreement in 1938 out of which this litigation arose.

Under this agreement they delivered their common stock, endorsed in blank, to the Maritime Commission representing the United States, and the Commission as a consequence released some of the plaintiffs from certain obligations, agreed to grant the corporation an operating subsidy, make a loan to it, and to obtain for it a loan from the Reconstruction Finance Corporation, contingent upon compliance with certain conditions. All of these things were done and by 1943 the corporation had fully paid all its indebtedness to the United States.

The plaintiffs then made demand for the return of the stock from the then members of the Commission, making the claim it had only been pledged as collateral for the debt which had been paid. The members of the Commission refused to honor this demand, contending that the shares had not been pledged as the plaintiffs claim but were in fact transferred outright —that the United States is the owner of them, and asserting that the delivery of the stock was not by way of collateral, as the plaintiffs say, to secure the indebtedness of Dollar of Delaware but was in fact and in law an outright transfer.

The plaintiffs make the further claim that if the contractual agreement of 1938 is interpreted or construed to vest in the defendants or the Commission or anyone else, any interest or title in the stock other than as collateral to secure the indebtedness of Dollar of Delaware, then the Commission and those purporting to act under its authority, were unauthorized by the Merchant Marine Act of 1936 as amended or by any other law, to take such title.

The plaintiff Dollar of California had been engaged in the transpacific freight and passenger service for many years. In 1923 it purchased from the old Shipping Board seven ships, and in 1925 it purchased from the same seller five other ships for opera-

tion in its business. Subsequently two others were built by virtue of construction loans obtained from the government. In 1929 Dollar of Delaware was organized and acquired from Dollar of California all of the ships and became the actual operating company.

These ships, twelve in number, were originally mortgaged to the United States to secure the purchase price, and the indebtedness of Dollar of Delaware was based principally on this transaction and that of the further moneys borrowed for the construction of two new ships referred to above.

There is no need to go into detail with reference to the precarious situation in which the line found itself in the years 1937–1938. Sufficient to say its financial structure was gravely impaired. It was delinquent in payment of its mortgage indebtedness; it had not recovered from the disasterous marine strike of the previous year; there was a general diminution of business apparently affecting the shipping business generally—but since the company's operations were around the world, and particularly in the Orient, the unsettled and continuing political unrest in that part of the world affected it most severely. These facts plus the loss of the S.S. President Hoover in the latter part of 1937 as a result of the perils of the sea, the elimination of Shanghai as a port of call, and the growing importunities and demands of creditors, made the company's ability to go on a matter of the gravest and deepest concern. To add to the seriousness of this general picture, the mail contracts of all steamship companies were cancelled by operation of law in 1937, and then it became impossible for the line to stay in business without a subsidy—this was granted temporarily, pending final resolution of its difficulties.

Whether or not as alleged, its financial condition was aggravated further, apart from the causes above referred to, by mismanagement and by the syphoning off of profits into salaries and affiliates, or as the plaintiffs allege by the failure of the Commission to aid and assist is beside the point—the *fact* is its position was desperate and bordering on the completely disasterous.

The Commission, charged by law with the responsibility of developing and maintaining a merchant marine both for the purpose of national defense and the continued development of foreign and domestic commerce, was naturally concerned with the imminent possibility that the only American flag line to the Orient might possibly be no longer able to continue in operation—and also because of its heavy indebtedness to the United States was of the opinion and it was agreed that stringent efforts would have to be made by both parties to stave off disaster.

As a consequence negotiations were entered into between them early in 1937 looking toward a possible way out. In August 1938 therefore, as a result of long preliminary negotiations, the controversial agreement was entered into and executed. For some time previous to that there had been suggestions and counter-suggestions and there were proposals for guarantees, collateral and pledges and new money emanating both from the Commission and the plaintiffs. The matter culminated as indicated. On August 19th in that year the agreement was amended so as to eliminate one of the shareholders who refused to come in, and with this change it was executed by all of the parties, as stated.

Under it plaintiffs transferred to the Commission or its nominees 92% of the voting stock of Dollar of Delaware. Of this 2,100,000 shares of B stock and 63,892 of A stock were delivered, endorsed in blank, and transferred to the Commission on the corporate records on October 26, 1938. The remaining 49,313 shares of the A stock, also transferred, being subject however to existing pledges remained in the custody of the pledgee until 1941 when they were in turn transferred on the corporate records to the Commission. The plaintiffs in turn were released from liability in respect to their obligations as noted above. The issue here, as has been said, is the nature and character of the transfer.

It is admitted by the defendants there was no discharge of the indebtedness by reason of the transaction, nor was the debt in any way reduced as a result of it. In the five years that have elapsed between

October 1938 and October 1943 the debt however has been paid and the company's financial integrity presumably assured. Dollar of Delaware continues to operate as American President Lines, Ltd., while the defendants continue to hold the stock.

Parenthetically it might here be said Dollar of California has the greater interest of all the plaintiffs. It claims all the 2,100,000 shares of the B stock and 2,075 shares of the A stock. R. Stanley Dollar claims 51,174 shares of the A, H. M. Lorber 9,174 shares of the A, and the Robert Dollar Company 37,722. It may be observed here also that two of the plaintiffs (Robert Dollar Company and R. Stanley Dollar) are preferred stockholders in the company while a third plaintiff (Dollar of California) was in a like position until 1942.

First of all as to the power of the Maritime Commission to enter into a transaction of the character it alleges it did, the Court holds that it has the power to negotiate and to take absolute title to the stock in question. It was created, from a functional point of view, for the purpose of permitting the conduct of its business in a manner similar to that of private enterprise and free as a consequence of the ordinary inhibitions applied to the regular executive branches of the government.

Its powers in this respect are similar to that of a business corporation. See generally Standard Oil Company of California v. U. S., D.C.1945, 59 F.Supp. 100, 106 affirmed, 9 Cir., 1946, 156 F.2d 312. The Court of Appeals for the District of Columbia in Dollar v. Land, supra, 154 F.2d at page 311 said: "We are in agreement with the view taken of this section", 46 U.S.C.A. § 1117, "of the law by the court deciding Standard Oil Company of California v. United States, D.C., 59 F. Supp. 100, involving the Maritime Commission. There the provision", 46 U.S.C.A. § 1117, "was treated in the same fashion as those statutes creating corporate instrumentalities for the conduct of public business."

The history of the Merchant Marine Act of 1936 as amended in 1938, 46 U.S.C.A. § 1101 et seq., and the purpose it was designed to accomplish lends emphasis to this conclusion. Even the language of the section under consideration, 46 U.S.C.A. § 1117, supports this view. "The Commission may enter into *such contracts,* upon behalf of the United States, and may make such disbursements as may, *in its discretion,* be necessary to carry on the activities authorized by this chapter, or to *protect, preserve,* or *improve* the *collateral* held by the Commission to secure indebtedness, in the same manner that a private *corporation* may contract within the scope of the authority conferred by its charter." (Italics supplied.)

What was the collateral here? It was the ships owned by Dollar of Delaware, which had been mortgaged to secure the purchase and other moneys advanced—so it would seem—in order to "protect, preserve, or improve" that collateral, the statutory power of the Commission to do what it claims it did would seem to be clear—apart from its right to perform its functions in a manner akin to those of a private corporation and apart from any power that might be incident to such performance.

The Opinion of the Attorney General (33 Ops.Atty.Gen. 570) cited with emphasis by the plaintiffs as authority contra is not apposite. That officer was dealing there with the proposition that the power did not exist to carry out a plan whereby transfer of title to government vessels to corporations charted under state law would be made in exchange for issuance to the government of such part of the authorized capital stock as would equal the appraised value of the vessels.

He held that this power did not under the Merchant Marine Act of 1920, 41 Stat. 988, authorize such an exchange—for as he said at p. 576:

"* * * I am of opinion that the statute authorizes a sale of the ships, and *not an exchange* of title thereto in consideration of stock in a corporation." (Italics supplied.)

"It was quite evidently the intention of Congress to authorize a sale for cash or on credits not to exceed 15 years from the making of the contract of sale. An exchange whereby the Government receives

shares of stock in return for its ships is not a sale and quite obviously does not meet the condition limiting deferred payments to 15 years."

And he concludes at p. 579:

"* * * it was not the intention of Congress to authorize the executive branch to organize corporations to take title to the Government's ships. * * *"

True on June 23, 1938 Congress amended not only Sec. 207, 46 U.S.C.A. § 1117, but it also enacted Sec. 215 of the Merchant Marine Act, 46 U.S.C.A. § 1125, which authorized the Commission to acquire ships by purchase or otherwise, amending also Sec. 202, Title 46 U.S.C.A. § 1112—but none of these changes in any way, in my view, affects for the reasons stated, the conclusion already reached, despite forceful argument to the contrary.

Further it follows that if the Commission has the powers of a private business corporation then it has what such an entity certainly impliedly has—the power to compromise claims—even if as in this instance those are claims of the United States, and Pan-American Petroleum & Transport Co. v. U. S., 1927, 273 U.S. 456, 501, 502, 47 S.Ct. 416, 71 L.Ed. 734 and Mammoth Oil Co. v. U. S., 1927, 275 U.S. 13, 35, 48 S.Ct. 1, 72 L.Ed. 137, are thus distinguished.

Assuming arguendo that the language of the section "* * * within the scope of the authority conferred by its charter * * *" means as counsel strenuously contends—"within the limits of the authority granted by the other sections of the Act" (P.B. 40)—that power is still implicit in Sec. 1117 as has been said.[1]

---

[1] As it stood in 1936 the law, § 1117, allowed the Commission to "enter into such contracts, upon behalf of the United States, as may, in its discretion, be necessary to carry on the *activities authorized by this Act* in the same manner that a private corporation may contract *within the scope of the authority conferred by its charter*." (Italics supplied.) 49 Stat. 1988.

In other words the Commission has all the powers of a private corporation as long as it looks for its authority to the activities expressed in the charter or act, as a private corporation would look to its charter. The act as a whole is in other words for the Commission what its charter is for a private corporation. It is true that expressio unius est exclusio alterius and for this reason on the surface at least it may be argued that had the general powers of a corporation been given the Commission there would have been no need to give the specific authority given in Sec. 1125 to purchase ships—because the greater (all the powers of a corporation) would have been included in the lesser (the power to purchase ships) as is argued. Such an assumption however is valid only if it can be said that such power to purchase ships was "necessary to carry on the activities authorized by this Act" or by way of an analogy as is expressed in the statute that it was within the scope of the authority conferred by its charter. (It is very possible that the draftsman of the act not knowing whether the power to purchase ships as expressed in Sec. 1117 could be found from a reading of the Act as a whole, descended from the general to the particular to make certain that such a power was within the "charter" of the Commission. Expressio unius est exclusio alterius can hardly be argued if the draftsman not knowing whether the intent to give such power had been expressed gave that power in particular.) It is not it seems to me a question of giving for a second time in Sec. 1125 a power previously given in Sec. 1117 but rather of making *certain* by a supplementary provision in particular that the scope of the power given in 1117 extended to the particular treated in 1125.

This argument is, it is admitted, purely supposititious but that it is reasonable appears from the legislative history of the act and from the fact that the same situation arose in reference to the particular part of the section (1117) here in issue.

H.R. #2168 in H.R.Rpts. 75th Cong. 3rd Sess. (Rep. Bland).

"Section 3. This amends Section 207 of the Merchant Marine Act of 1936. Section 207 of the act provides that 'the Commission may enter into such contracts, upon behalf of the United States, as may, in its discretion, be necessary to carry on the activities authorized by this Act, in the same manner that a private corporation may contract within the scope of the authority conferred by its charter.' The amendment adds that it 'may make such disbursements' as may, in its discretion, be necessary 'to protect, preserve, or improve the collateral held by the Commission to secure indebtedness,' in the same manner as a private corporation. *The amendment is de-*

924

The argument that the Government by taking title to the stock became a citizen so to speak of itself, the statute, 46 U.S.C.A. § 802, providing "* * * no corporation * * * shall be deemed a citizen of the United States unless the controlling interest therein is owned by citizens of the United States * * *"—and hence the law is contravened—is somewhat naive. The Northern No. 41, D.C.Fla.1924, 297 F. 343, CF. United States v. United Mine Workers, 1947, 330 U.S. 258, at page 272, 67 S.Ct. 677, 91 L.Ed. 884, wherein it is said "* * * statutes which in general terms divest preexisting rights or privileges will not be applied to the sovereign without express words to that effect." Dollar of Delaware is still a citizen and was never divested of that character. In the Opinion of the Attorney General, supra, that official said:

"As pointed out in United States v. Strang, 254 U.S. 491 [41 S.Ct. 165, 65 L.Ed. 368], a corporation, notwithstanding ownership of *all* its shares by the Government, is, juristically, a separate entity * * *." (Italics supplied.)

With reference to the agreement itself it certainly leaves much to be desired from the standpoint of both clarity and precision. But it can hardly be argued with conclusive cogency that its intent was to regard the transfer as a pledge or as a substitution of collateral—if *as a consequence* the plaintiffs liable were to be released as co-makers, or as sureties or guarantors (no matter what the character of their obligation was) on *Dollar of Delaware's debt* to the United States, having in mind its precarious financial situation at the time. The collateral security for the

*signed to make clear a power which it is thought already exists in the Commission but about which some doubt has been expressed. Under the act the Maritime Commission has all the general and implied powers of a business corporation.*" (Italics supplied). (The rest of this paragraph from the House Report is quoted on Page 27 of the Original Brief for the Plaintiffs which the above omitted.)

The Senate Committee on Commerce had this to say about the Section in question in its report, Sen.Rep. 1618, 75th Cong. 3rd Sess. (Senator Copeland).

"Section 207 of the act now provides that 'the Commission may enter into such contracts, upon behalf of the United States, as may, in its discretion, be necessary to carry on the activities authorized by this Act, in the same manner that a private corporation may contract within the scope of the authority conferred by its charter'. The amendment adds that it 'may make such disbursements' as may, in its discretion be necessary 'to protect, preserve, or improve the collateral held by the Commission to secure indebtedness,' *as is the practice in the private corporation. It is believed that such authority already exists in the Commission, but the amendment is recommended in order to remove any doubt that the Commission* possesses the power to advance or expend funds for such purposes where found necessary." (Italics supplied.)

It seems obvious from these reports that the draftsman was in doubt as to whether or not a contract "to *protect,*

*preserve,*" etc., collateral was within the "activities authorized by this act" even though the draftsman had so intended it; therefore the amending addition was in order to make this certain. The scope of authority which may or may not have included such a purpose previously certainly included it thereafter.

Such a purpose clearly being within its "charter" the Commission could contract in the same manner as a private corporation following the analogy set out in the act. A private corporation given such powers as were given by the amending provision to "protect, preserve, etc." in its charter along with the powers "necessary to carry on the activities authorized by this act" certainly could make the purchase contended for here, for to say that the Commission (or again by way of analogy a private corporation) could foreclose on collateral at a foreclosure sale and buy in (taking title) if there are no other bidders willing to bid sufficient to pay the debt (see Pltffs. Orig. Brief page 26) but that it could not buy in at any previous time if circumstances became such that it should to preserve the collateral, is to say that in construing the word "preserve" in Sec. 1117 the Court should find the intent of Congress to be that the Commission or any private corporation with like powers must as a rescuer of its collateral sit idly by and watch while all is lost. This does not make sense.

The mere fact that Congress has descended from the general to the particular in the instances indicated, as has been observed, in no way it seems to me gainsays this.

debt was their contingent liability in case of Dollar of Delaware's default—so when the stock was transferred there was nothing in the transaction to indicate it was for any debt then owed by them to the United States and the argument that it is to be regarded as *further* collateral for an existing debt of theirs falls of its own weight. The Government by the act of transfer never became their creditor or mortgagee, their liability being purely contingent on default by the debtor Dollar of Delaware—so while it is admitted that it is sound law that "* * * when a debtor deposits property with his creditor, in the absence of any showing as to the purpose with which the deposit is made or received, it is *presumed* that it was *intended* as a collateral security for the debt." Borland v. Nevada Bank, 1893, 99 Cal. 89, 95, 33 P. 737, 739, 37 Am.St.Rep. 32 (emphasis supplied)—the analogy fails for as has been said there was *no debt* for *there never was any mortgagor-mortgagee* relationship between the *Commission* and the *plaintiffs* since 1929 when the ships were conveyed to Dollar of Delaware.

■ Plaintiffs not being mortgagors, they had therefore no equity of redemption in the ships. "The equity of redemption is a distinct estate from that which is vested in the mortgagee before or after condition broken. It is descendible, devisable, and alienable like other interests in real property." Clark v. Reyburn, 1868, 8, Wall. 318, 321, 322, 19 L.Ed. 354. While here the property was personalty the same observation applies. True the debt is regarded as the principal and the mortgage only as an accessory and security—but the mortgage *was* Dollar of Delaware's as has been said—and the liability of the plaintiffs on the debt a purely contingent one. They had no right, title or interest in the ships and the right to regain free and clear title by payment of the debt is in the party having title in the res given as security. Moore v. Beasom, 1862, 44 N.H. 215, 218.

■ Paragraph 23(d), it may be admitted, is susceptible of two interpretations—read alone it lends color at least to the plaintiff's view, but the instrument must be read and construed as a whole and not in parts, and in the light of all the attendant circumstances.

Counsel vigorously urges however that "if the Commission's Special Counsel, who prepared this draft, and its General Counsel, who reviewed it and ordered numerous changes to be made, * * * did not in the private recesses of their minds intend by the words we have emphasized above to indicate that the stock was transferred as security only, their acts certainly were a representation to the proposed transferors that such was the character of the transaction * * *."

" 'Intention,' " he continues quoting, "when used with reference to a written instrument, signifies the meaning of the words used 'deducible from the language of the contract and the acts of the parties.' "

■ But the same argument can be used nonetheless as forcibly against the plaintiffs, for when a contract is ambiguous the surrounding circumstances including the acts of the parties can be considered for clarification of their intention. Lowber v. Bangs, 1864, 2 Wall. 728, 737, 17 L.Ed. 768; Pitcairn v. American Refrigerator Transit Co., 8 Cir., 1939, 101 F.2d 929, 937; Moran v. Prather, 1874, 23 Wall. 492, 501, 23 L.Ed. 121.

Paragraph 4 of the Agreement provided for a transfer of "all rights and interests" in the A stock subject to existing bank pledges—and each transferor executed a so-called assignment stating that it "hereby sells, assigns, transfers, and sets over unto the Commission subject to said existing pledge all his right, title, and interest in and to said Class A stock."

Mr. Dollar and Mr. Lorber were men of large interests and great business experience, and it certainly cannot be argued that Dollar of California was in the dark as to the meaning of such language—and all three had the assistance of able counsel throughout.

Further, in the Commission's proposals of April 28, 1938, which subsequently fell through, a "pledge" of stock was sought and the plaintiffs' replies indicate beyond doubt they knew the meaning and import of the word, as also that of the word "guarantee."

But more significant and more damaging to their case and conclusive is their own interpretation in the nature of admissions against interest, *after* the deal was made and long before this suit was entered. R. Stanley Dollar in December 1940 referred to himself—his reference to the others not being binding on them—as a former *owner* of the stock in controversy, while in his tax return for the year 1938 he indicated that the contract provided for "the surrender and transfer" of all right, title and interest in the A stock thus listed in his return. The plaintiff Lorber was of the same opinion, and the balance sheet of plaintiff Dollar of California as of December 31, 1938 indicated a similar view with respect to its conclusions as to the character of the matter, while strangely enough the stock was again set up on its books in 1942 as an asset after counsel had been employed to recover it. The executors of the estate of the late J. Harold Dollar, Keith Ferguson and Robert Dollar II, who were also parties to the agreement in issue, petitioned the California courts for an order authorizing the *sale* to the Commission of all its "right, title and interest" in the A stock held by it which was approved. This while it may or may not be a quasi-admission certainly is a "surrounding circumstance" which cannot be overlooked because of its clear showing of the intent of these two parties to the agreement.

Further the Dollar interests were insistent that the Dollar name, flag and insignia, be no longer used by Dollar of Delaware and that some provision be made for the absorption by it of some if not all of the employees of the management company, The Robert Dollar Company. These are facts whose significance cannot be explained away.

■ Stress has also been laid on the fact that "equity will not permit the mortgagee" to secure "from the mortgagors. stockholders a conveyance of the same control of the equity of redemption as it would have received had the corporation itself conveyed. Otherwise the rules of equity applicable to a release of the equity of redemption would become a sham." No authority is cited in support of this proposition, but it may be pointed out here that a "corporation is a person and its ownership is a nonconductor that makes it impossible to attribute an interest in its property to its members." Klein v. Board of Tax Supervisors, 1930, 282 U.S. 19, 24, 51 S.Ct. 15, 16, 75 L.Ed. 140, 73 A.L.R. 679.

With reference to the claim of gross disparity and bargaining power this argument carries no weight. The Commission was as reluctant to assert its rights as a creditor against Dollar of Delaware and as anxious to have the operation of the line continue as were the Dollar interests; and the individual plaintiffs stood to gain by being bailed out of a situation that for them at the time was bordering on the catastrophic, as most certainly neither Dollar of California nor its affiliates, nor the personal plaintiffs would escape unscathed if the line went to the wall. The whole history of negotiations between the parties leading up to the agreement of August 15, 1938, lends emphasis to the fact that the end result to be obtained, if. at all possible, was the continuation of the line in business. There were proposals for "guarantees," and as has been observed, of pledge and collateral stemming from both sides, but time and circumstances became master of the situation and apparently it was felt that the only hope of solution and the only circumstances under which an operating subsidy could then be granted and further public money poured into a sinking enterprise in an effort to salvage it, was by its complete divorcement from both the personal and corporate plaintiffs.

■ I am of the opinion therefore that the transfer was outright and one of title and so hold. A great deal of stress has also been laid by exceedingly able and resourceful counsel on the so-called value of the stock. With reference to that let it simply be observed the line was at the end of its resources and there is a serious question as to whether or not the stock had any value at the time.[2] In essence the situation it seems to me comes down factually to

---

[2] In the executor's petition mentioned above it is alleged that at a forced sale the value of the ships would be insufficient to pay the debt due the United States and there would be a large deficiency judgment entered.

this: the plaintiffs were caught between Scylla and Charybdis. On the one side was disaster complete and irretrievable, which meant undoubtedly not only the end of Dollar of Delaware but in all probability, if not the end then certainly damage of an irreparable character to Dollar of California and its affiliates, and to the financial stability of the personal plaintiffs. On the other there was still hope of saving something. They decided to jettison what they could, to save themselves and Dollar of California and its associated enterprises.

This memorandum opinion will serve as provided by the rule, Federal Rules of Civil Procedure, rule 52(a), as amended, 28 U.S.C.A., as the court's findings of facts and conclusions of law, counsel will submit proper order.