285 F.2d 797
 Michael M. KEARNEY, and Michael M. Kearney and Clinton Monroe Hester, A Special Partnership, and Michael M. Kearney and Clinton Monroe Hester, A General Partnership D/B/A Law Offices, Clinton M. Hester
v.
UNITED STATES.
 No. 139-59.
 United States Court of Claims.
 January 18, 1961.
 Rehearing Denied March 31, 1961.
 
 Michael M. Kearney, New York City, for plaintiffs.
 Kendall M. Barnes, Washington, D. C., with whom was George Cochran Doub, Asst. Atty. Gen., for defendant.
 JONES, Chief Judge.
 
 
 1
 This suit is a faint echo of the resounding litigation which became known as Dollar v. Land. The plaintiffs allege that they were employed on behalf of R. Stanley Dollar, the Dollar Steamship Line and others[1] to institute suit against the officials of the United States Maritime Commission to recover certain shares of common and preferred stock of the Dollar Steamship Line, Inc., Ltd. It was the contention of the Dollars that these shares were surrendered to the Maritime Commission in 1938 as substituted collateral to secure a debt due the Commission. The debt was fully repaid in 1943 but the Maritime officials withheld the shares under the claim that they belonged to the United States. The Court of Appeals for the District of Columbia Circuit ruled that the Dollars were entitled to possession of the stock. 87 U.S.App.D.C. 214, 184 F.2d 245, reversing D.C.1948, 82 F.Supp. 919. The Supreme Court denied certiorari. 1950, 340 U.S. 884, 71 S.Ct. 198, 95 L.Ed. 641. When the members of the Maritime Commission and the Secretary of Commerce, Charles Sawyer, refused to endorse and deliver the stock, they were adjudged to be in contempt of court. 1951, 89 U.S. App.D.C. 38, 190 F.2d 623. Simultaneously, the United States instituted suit in the District Court for the Northern District of California to quiet title to the stock. 1951, 97 F.Supp. 50. Prohibitory injunctions were granted against almost all of the parties to the suits at different times by the various courts. In all, the litigation wandered through the courts for 7 years, occupied the Supreme Court on 6 different occasions and resulted in at least 13 opinions from the separate courts.[2] Finally, on June 6, 1952, the litigants agreed to a compromise settlement of the case and all pending appeals and petitions were dismissed. Under the terms of the agreement the stock was transferred to a trustee who was directed to dispose of it at public sale and distribute the proceeds equally between the United States and the Dollars. On October 31, 1952, the trustee sold 2,100,000 shares of class B stock and 100,145 shares of class A stock for about $18,000,000. Shortly thereafter, the Government accepted about $9,000,000 as its share of the proceeds.
 
 
 2
 It further appears that there was another block of 13,061 shares of class A stock which had not been involved directly in the litigation between the Dollars and the Government. The briefs before us do not disclose the precise relationship of this stock to the controversy and the litigants. It is clear, however, that under a separate agreement this block of stock was sold by the trustee on July 8, 1953. The proceeds of this sale, amounting to approximately $376,000, were distributed to the litigants — 60 percent to the Dollars; 40 percent to the Government.
 
 
 3
 Plaintiffs state in their petition that their employment with the Dollars had been under a contingent fee contract. They were to receive as compensation 225,000 shares of the class B stock in suit if they secured redelivery of all the shares to the Dollars. Plaintiffs were to receive nothing for their services if they were unsuccessful. When the plaintiffs became aware of the settlement agreement between the Dollars and the Government (by this time plaintiffs were no longer representing the Dollars) they sought to enforce their rights in the stock by an action against the Dollars in a Delaware state court. The plaintiffs sued to enforce an attorney's lien on the entire fund of stock and to obtain possession of 225,000 shares of class B stock. The Delaware court refused to enjoin the trustee-sale of the stock unless plaintiffs posted a bond in the amount of $1,000,000, whereupon plaintiffs dismissed the suit with prejudice. Shortly thereafter the plaintiffs executed an agreement releasing the Dollars from all claims for attorneys' fees in exchange for $75,000.
 
 
 4
 The plaintiffs have now come into this court contending that they possessed a valid attorney's lien on all the stock, which vested in them when the Court of Appeals for the District of Columbia Circuit adjudged the Dollars entitled to possession of the stock as against the members of the Maritime Commission. Furthermore, they urge that the compromise settlement between the Dollars and the Secretary of Commerce was illegal because the "Secretary of Commerce and those persons acting in concert or participating with him on his behalf had been enjoined by the order of the United States District Court of the District of California[3] from selling, offering for sale, disposing or offering to dispose in any manner whatsoever the stock in controversy." Overlaying plaintiffs' entire argument is the reassertion that the United States never had a proprietary interest in the stock after the loan to the Dollars was repaid, and by accepting a share of the proceeds from the sale of the stock it has been unjustly enriched at the expense of the plaintiffs. Thus would plaintiffs reopen the Pandora's box of Dollar v. Land.
 
 
 5
 The Government has raised several defenses. It asserts with considerable plausibility that plaintiffs' release of the Dollars bars them from proceeding against the United States on the same claim. Furthermore, the Government claims that whatever unlawful acts of taking might have been accomplished, none has occurred since March 25, 1953, 6 years prior to the date plaintiffs filed their petition in this court, and plaintiffs are thus barred by the statute of limitations. While this defense seems meritorious as to the claim arising from the original stock sale in 1952 its application to the claim from the subsequent sale (of 13,061 shares of class A stock on July 8, 1953) is not explained. But these defenses require no further comment since we agree with the Government's contention that the lien here asserted was a nullity under the provisions of the Anti-Assignment Act, 10 Stat. 170, as amended, 31 U.S.C.A. § 203. This conclusion follows from our decision in Pittman v. United States, 116 F.Supp. 576, 127 Ct.Cl. 173, certiorari denied 1954, 348 U.S. 815, 75 S.Ct. 23, 99 L.Ed. 642.
 
 The statute reads:
 
 6
 "All transfers and assignments made of any claim upon the United States, or of any part or share thereof, or interest therein, whether absolute or conditional, and whatever may be the consideration therefor, and all powers of attorney, orders, or other authorities for receiving payment of any such claim, or of any part or share thereof, except as hereinafter provided, shall be absolutely null and void, unless they are freely made and executed in the presence of at least two attesting witnesses, after the allowance of such a claim, the ascertainment of the amount due, and the issuing of a warrant for the payment thereof. Such transfers, assignments, and powers of attorney, must recite the warrant for payment and must be acknowledged by the person making them, before an officer having authority to take acknowledgments of deeds, and shall be certified by the officer; and it must appear by the certificate that the officer, at the time of the acknowledgment, read and fully explained the transfer, assignment, or warrant of attorney to the person acknowledging the same. * * *" [Emphasis supplied.]
 
 
 7
 In our opinion in Pittman we discussed in detail the fate of attorney's liens under this statute. Suffice it to say that we concluded there, as we are bound to conclude here, that a contract between an attorney and a client which gives the attorney an interest in the client's claim against the Government is exactly what the anti-assignment statute forbids. Here, plaintiffs' petition sets forth that they were employed on a "contingency fee contract under which they were to receive as their compensation 225,000 shares of the common stock (class B) * * * if they were successful in recovering the stock unlawfully withheld * * * by officials of the Maritime Commission." Plaintiffs rephrase the thought in their brief: "Plaintiffs under their contingent fee contract were assignees and had attorney's liens on 225,000 shares of B stock." Call it an attorney's lien, an assignment, an equitable interest or by any other name, the contract between the plaintiffs and the Dollars gave over to plaintiffs an interest in their client's claim against the Government. This was precisely the evil the Congress intended to outlaw by the anti-assignment statute.
 
 
 8
 In view of the conclusion we have reached, we do not pass upon the other issues raised by the parties.
 
 
 9
 For the reasons indicated, defendant's motion is granted, plaintiffs' motion is denied, and plaintiffs' petition will be dismissed.
 
 
 10
 It is so ordered.
 
 
 11
 DURFEE, LARAMORE, MADDEN, and WHITAKER, Judges, concur.
 
 
 
 Notes:
 
 
 [1]
 Referred to hereafter as the "Dollars."
 
 
 [2]
 We have only sketched the litigation. A more complete history of the case may be obtained from the reports, in chronological order:
 1946, 81 U.S.App.D.C. 28, 154 F.2d 307; 1947, 330 U.S. 731, 67 S.Ct. 1009, 91 L.Ed. 1209; D.C.1948, 82 F.Supp. 919; 1950, 87 U.S.App.D.C. 214, 184 F. 2d 245; 1950, 340 U.S. 884, 71 S.Ct. 198, 95 L.Ed. 641; 1951, 88 U.S.App.D.C. 162, 188 F.2d 629; 1951, 340 U.S. 948, 71 S. Ct. 533, 95 L.Ed. 684; D.C.1951, 97 F. Supp. 50; 1951, 88 U.S.App.D.C. 311, 190 F.2d 366; 1951, 89 U.S.App.D.C. 38, 190 F.2d 623; 1951, 341 U.S. 737, 71 S. Ct. 987, 95 L.Ed. 1331; Dollar v. U. S., 9 Cir., 1951, 190 F.2d 547; D.C.N.D. Cal.1951, 100 F.Supp. 881; 1951, 342 U.S. 910, 72 S.Ct. 304, 96 L.Ed. 681; 9 Cir., 1951, 193 F.2d 114; 9 Cir., 1952, 196 F.2d 551; 1952, 344 U.S. 807, 73 S.Ct. 4, 97 L.Ed. 628.
 
 
 [3]
 Plaintiffs are mistaken. The District Court for the Northern District of California enjoined the Dollars from disposing of the stock. 97 F.Supp. 50. Order set out in 341 U.S. at pages 744, 745, 71 S.Ct. 987. Perhaps plaintiffs inadvertently substituted "California" for "Columbia."