**Murdaugh Stuart MADDEN and Clifford J. Hynning**

v.

**The UNITED STATES.**

No. 399–62.

United States Court of Claims.

Jan. 20, 1967.

Clifford J. Hynning, Washington, D. C., attorney of record, pro se and for plaintiff Murdaugh Stuart Madden.

Manfred J. Schmidt, Washington, D. C., with whom was Asst. Atty. Gen., Barefoot Sanders, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, and SKELTON, Judges.

## OPINION

PER CURIAM.*

The present plaintiffs, two Washington lawyers, successfully prosecuted a claim on behalf of Industrial Finishers, Inc., an Ohio corporation, against the Cleveland Ordnance District (of the Army) for an equitable adjustment under a contract performed by Finishers for Cleveland Ordnance. They accepted the retainer on a contingency basis which was later amplified by an express agreement for 30 percent of the recovery. After they had established Finishers' right to an equitable adjustment in the amount of $34,000 (reflecting a fee of $10,200), the Small Business Administration asserted rights to $20,000 of the fund under an assignment theretofore executed by Finishers, and the Internal Revenue Service asserted tax liens for $16,904.67. Ordnance ultimately disbursed the fund to SBA and IRS, leaving nothing for plaintiffs. They sue here, claiming an attorney's lien under Ohio law.

Defendant argues, among other defenses, that the right of setoff where the Government is both debtor and creditor is established by statute (31 U.S.C. § 227) and by controlling decisions.

---

\* This opinion is largely based on portions of the opinion prepared by Trial Commissioner W. Ney Evans at the direction of the court. The court does not consider certain issues discussed by the commissioner.

"[O]ne whose own appropriation and payment of money is necessary to create a fund for general creditors is not a general creditor. He is not compelled to lessen his own chance of recovering what is due him by setting up a fund undiminished by his claim, so that others may share it with him. In fact, he is the best secured of creditors; his security is his own justified refusal to pay what he owes until he is paid what is due him." United States v. Munsey Trust Co., 332 U.S. 234, 240, 67 S.Ct. 1599, 1602, 91 L.Ed. 2022 (1947). See also General Casualty Co. of America v. United States, 127 F.Supp. 805, 808, 130 Ct.Cl. 520, 526 (1955), cert. denied, 349 U.S. 938, 75 S.Ct. 783, 99 L.Ed. 1266; Standard Accident Ins. Co. v. United States, 97 F.Supp. 829, 831, 119 Ct.Cl. 749, 766 (1951), and Seaboard Surety Co. v. United States, 67 F.Supp. 969, 972, 107 Ct.Cl. 34, 46 (1946), cert. denied, 330 U.S. 826, 67 S.Ct. 863, 91 L.Ed. 1275 (1947).

Plaintiffs would negate defendant's right of offset "by invoking the doctrine of equitable estoppel" because of alleged deceptive practices by the Government agencies, primarily Small Business Administration. It is unnecessary to decide the applicability of equitable estoppel in a proper case because in this instance the alleged deceptive practices are not established in fact.

As shown by the findings, Finishers (plaintiffs' client), in June 1958, undertook a contract with Cleveland Ordnance for the modification of certain shell cartridge cases. At the same time Finishers obtained a loan from the Small Business Administration, payable in monthly installments over a period of 10 years. In the performance of the contract, Finishers incurred substantial losses attributable, according to it, to requirements imposed by the contracting officer, because of which Finishers pressed the claim for an equitable adjustment which ultimately resulted in the creation of a fund (in the hands of Ordnance) of $34,000.

Six months after the SBA loan was made, in January 1959, Finishers failed to make the monthly payment due on the SBA loan. Regular payments were never resumed, and the loan was ultimately called. Meanwhile, however, there were many conferences between Finishers and SBA looking toward possible methods of retrieving the business losses and restoring the borrower's credit to acceptable levels.

In June 1959, the plaintiff Madden was requested and agreed to handle Finishers' claim against Cleveland Ordnance for an equitable adjustment. Mr. Madden agreed to take the case on a contingent fee basis without specifying the percentage of the contingent fee.[1]

Three weeks later, in one of many conferences between Finishers' president, Mr. Paul R. Dukes, its Cleveland attorney, Mr. Howard C. Cook, and SBA's Cleveland Loan Examiner, Mr. T. J. Nolan, Mr. Dukes told Mr. Nolan that Finishers' claim against the Government had been filed in the approximate amount of $60,000 by attorneys in Washington on a contingent basis. Mr. Nolan informed Mr. Dukes that SBA would like to have some assurance from the Washington attorneys as to the validity of the claim and some idea as to when it would be settled; also assurance from Mr. Dukes that if the claim was valid, he (Mr. Dukes) would pay the interest on the loan until such time as funds were received as a result of the claim; otherwise, SBA would have to take steps to protect its interest.

After another 2 weeks, on July 10, 1959, Mr. Madden, at the request of Mr. Dukes, wrote to SBA, saying that he was confident Finishers would be successful since the Army had ordered modifications of the contract. Mr. Madden received no acknowledgment of or reply to his letter until the SBA letter of October 5, 1959, hereinafter noted.

Meanwhile, during August and September 1959, SBA continued to press

---

1. The specific agreement for a contingent fee of 30 percent of the recovery was made 16 months later, in October 1960.

Mr. Dukes for measures by which the status of Finishers' loan might be improved. The exchanges between Mr. Dukes and Mr. Nolan culminated in late September in an arrangement whereby Finishers would pay $500 per week until the end of the year to cover interest charges[2] and consent to an assignment of 50 percent of its claim against Ordnance ("but in no event on an amount not less than would be required to pay the principal amount delinquent on account of the loan");[3] in return for which SBA "would continue to work with him for the next 90 days which would no doubt be sufficient time for the settlement of the * * * claim."

On September 30, 1959, Finishers executed for delivery to SBA "in consideration of the extension of credit" an assignment of $20,000 "of any and all amounts now due or owing, or which may hereafter be or become due or owing * * * by the United States * * * to the assignor * * *" under the Ordnance contract. The assignment was prepared by Mr. Cook, Finishers' Cleveland attorney, as "a modification of the form usually utilized by * * * [him] in the State of Ohio," and its execution was supervised by him. The amount of the assignment was related to the amount of the additional security requested by SBA in the light of the delinquency of the debt of Finishers to SBA.

Finishers' contract with Ordnance contained, as Article 8(a) of the General Provisions, the text of the Assignment of Claims Act of 1940, as amended (31 U.S.C. § 203, 41 U.S.C. § 15) which authorized the assignment of claims for monies due or to become due to a contractor from the Government to "a bank * * * or other financing institution, including any Federal lending agency." The Act specifically provided that "any such assignment shall cover *all* amounts payable * * *." [Emphasis supplied.]

When Finishers made the assignment to SBA of $20,000 of its claim against

Ordnance, the claim had not been allowed, wherefore no monetary amount had been determined. The claim was being discussed, however, in terms of $40,000 to $60,000, and there can be no doubt from the evidence of record that both Finishers and SBA intended an assignment of part only (approximately half) of the estimated value of the claim.

If any of the individuals who participated in the assignment transaction, including its ultimate approval by the Regional Director of SBA, was aware of the requirement (by contract and statute) that "any such assignment shall cover all amounts payable" under the contract, the fact is not in evidence. By reason of the presence of the requirement in the contract, it goes without saying that they should have been aware of it.

On October 5, 1959, SBA wrote to Mr. Madden, referring to his letter to SBA of July 10, 1959, and saying:

> * * * As you no doubt know we have a direct interest in this claim, insofar as our loan is concerned and the subject Borrower's operations.
>
> We would be pleased if you will advise us as to what progress you have made in the settlement of the claim.

Mr. Madden forwarded the letter to Mr. Dukes who, on October 21, wrote to Mr. Madden as follows:

> We are very much interested and concerned about our claim for reimbursement, and if the writer can help with any information at the present time please let me know.
>
> Small Business Administration is interested in our claim progress, as per their letter to you of October 5th, because the writer has signed over half of what we obtain when the time comes, to pay against reimbursement of the SBA loan.

This exchange of correspondence made no particular impression upon Mr. Madden at the time. He had filed Finishers' claim with the contracting officer at

---

2. Interest charges for the year 1959 would have been of the order of $6,650.

3. Payments on principal for the year 1959 would have been of the order of $10,000.

Ordnance and there was little more that he could do until the contracting officer rendered his decision. Since he had no responsibility for Finishers' efforts to improve the status of its loan with SBA, he did not undertake to inform himself of the progress of those efforts. Mr. Hynning, when he came into the picture a year later (October 1960), likewise failed to attach any importance to the letter of October 21, 1959, from Mr. Dukes to Mr. Madden which, presumably, was in Mr. Madden's file.

On May 11, 1960, Ordnance's contracting officer denied Finishers' claim, and Mr. Madden, on June 14, docketed an appeal to the Armed Services Board of Contract Appeals. The board scheduled a hearing for November 15, 1960.

Meanwhile, although SBA continued to work with Mr. Dukes in his efforts to attain a satisfactory payment structure for his loan, the results were discouraging. In September 1960, Finishers ceased operations.

Hearings on the claim were held by ASBCA on November 15 and 16, 1960, with Mr. Hynning appearing for Finishers. At the request of Government counsel, the board ordered a severance of the issues, for determination separately of the issues of liability and damages. Seven months later (June 1961) the ASBCA sustained Finishers' appeal and remanded the case to the contracting officer in Cleveland for negotiation of the amount of the price adjustment.

When Mr. Hynning went to Cleveland, in July 1961, to negotiate the adjustment, he learned for the first time of Finishers' assignment to SBA. Although he was astonished and somewhat perturbed by it (and considered it legally invalid as being in contravention of the Assignment Act of 1940), he persevered in his efforts to negotiate an adjustment and, in October 1961, obtained Ordnance's confirmation of settlement in the amount of $34,000. A month later the Internal Revenue Service served on Finishers a Notice of Levy for $16,904.67 for taxes assessed and unpaid. SBA had already filed with Ordnance copies of its assignment from Finishers.

Thereafter, correspondence was exchanged between Mr. Hynning, on the one hand, and attorneys for SBA, Ordnance, and IRS, on the other, and between attorneys for SBA and attorneys for IRS. The end result was that plaintiffs' claim was referred to the General Accounting Office which disallowed it by letter of July 3, 1962, to Mr. Hynning, advising him:

> * * * The relationship of attorney and client is purely a matter of their mutual arrangement and does not render such attorney privy to contractual relationship between the Government and its contractors.
>
> It is the general rule that attorney fees are not allowed in suits against the Government without an express statutory provision allowing them. Piggly Wiggly Corp. v. United States [81 F.Supp. 819] 112 Ct.Cls. 391.

Ordnance thereupon paid $20,000 to SBA and $14,000 to IRS, thereby exhausting the fund.[4]

The inferences of conspiracy, deception, misrepresentation, and knavery, without which plaintiffs cannot prevail, are not warranted by the evidence.

The evidence upon which plaintiffs must rely for such inferences relates to two separate episodes in the unfolding of the transactions. One episode pertains to the actions of SBA in obtaining the assignment and the alleged conspiracy of silence and concealment thereafter, with SBA's Loan Examiner, Mr. Nolan, and Finishers' president, Mr. Dukes, and its Cleveland attorney, Mr. Cook, as participants. The other episode concerns the actions of attorneys for SBA, for IRS, and for Ordnance in the negotiations more than 1 year later with Mr. Hynning concerning disbursement of the

---

4. SBA, standing on its rights under the assignment from Finishers, had persuaded IRS to yield priority to SBA, authorizing payment to SBA of the full amount of the assignment, while IRS, in accepting the balance, suffered a reduction of its claim.

fund. There is nothing in the evidence to relate one group of participants to the other.

The correspondence which passed between attorneys in the later of the two episodes reflects the determination of the Government attorneys to protect the interest of their respective agencies, even at the expense of plaintiffs, if necessary, and there is about it an aura of lack of candor toward Mr. Hynning. As of that time, however, the merit or lack of merit of the charges of improper silence, ignorance, and deception on the part of those who participated in the assignment transaction was already fixed, and the maneuvers of the attorneys in protecting the rights of their agencies could have no effect upon those facts. In other words, the Government's rights of offset, on behalf of both SBA and IRS, were already fixed, and the validity of the SBA assignment or the priority of the IRS tax levy had nothing to do with the final outcome, absent proof of the alleged conspiracy, deception, or misrepresentation.

As noted in the findings,[5] the evidence as a whole does not warrant an inference that knowledge of the assignment by Finishers to SBA was deliberately withheld from plaintiffs by Finishers, SBA, or Ordnance, or that any action by any of the three was designed or intended to keep such knowledge from plaintiffs.

SBA's Loan Examiner, Mr. Nolan, was not a lawyer, and the office routine of SBA within which he worked apparently did not require scrutiny for legal clearance of his action in obtaining the assignment from Finishers. Having applied a banker's instinct to the improvement of the appearance of Finishers' paper he was content to have Finishers' Cleveland lawyer, Mr. Cook, draw up and supervise the execution of the assignment. Mr. Cook, as Finishers' loan attorney, appears to have been oblivious to the Assignment of Claims provision in Finishers' contract with Ordnance or to any possible impact of such an assign-ment upon the prosecution by other lawyers of Finishers' claim for an equitable adjustment. Mr. Dukes evidently thought he was apprising Mr. Madden of the situation when he wrote, on October 21, 1959, that he had "signed over half of what we obtain when the time comes, to pay against reimbursement of the SBA loan." Moreover, both plaintiffs knew or should have known of the existence of the SBA loan (apart from the assignment), and they are charged with knowledge of the Government's right to offset a debt owed to it. In all the circumstances, there was no such obligation on SBA, itself, to notify the plaintiffs of the assignment as could possibly destroy or diminish the Government's ancient right of set-off.

■ The failure by plaintiffs to establish a basis upon which to preclude defendant's right to offset Finishers' debts to SBA and IRS, independently of the assignment to SBA and the levy of IRS, requires recognition of the right of offset as superior to the claimed attorneys' lien. Therefore, discussion is unnecessary of (1) the validity of the assignment, (2) the priority of the levy, (3) the impact or lack thereof of the Anti-Assignment Act upon the claimed attorneys' lien, (4) the effect on the Government's right of set-off of proved malfeasance or misrepresentation by its representatives, (5) whether plaintiffs had an attorneys' lien under whatever law was applicable, (6) what law is applicable to determine such a lien, or (7) the jurisdiction of this court over any claim grounded on an attorney's lien. In particular, the court does not reach or decide whether an attorney can ever assert an attorney's lien against the United States for the collection of fees to which his client (a claimant against the Government) has agreed. See Pittman v. United States, 116 F.Supp. 576, 127 Ct.Cl. 173 (1953), cert. denied, 348 U.S. 815, 75 S.Ct. 23, 99 L.Ed. 642 (1954); Empire Ordnance Corp. v. United States, 128 F.Supp. 744, 130 Ct.Cl. 719 (1955),

5. Finding 16(b) and n. 24.

and Kearney v. United States, 285 F.2d 797, 152 Ct.Cl. 202 (1961), cert. denied, 366 U.S. 935, 81 S.Ct. 1660, 6 L.Ed.2d 847.

The plaintiffs are not entitled to recover and their petition is dismissed.

